## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **BRENDA DAVIS-WRIGHT,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 5:07-CV-1032-VEH** |
| | ) |
| **TELEDYNE BROWN** | ) |
| **ENGINEERING, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

---

## <u>MEMORANDUM OPINION</u>

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Brenda Davis-Wright ("Wright") initiated this Title VII, § 1981, and § 1983 lawsuit on June 4, 2007, alleging race and/or sex discrimination against Defendant Teledyne Brown Engineering, Inc. ("Teledyne"). (*See generally* Doc. 1; *id.* ¶¶ 29-33). Teledyne filed its answer (Doc. 8) on July 10, 2007.

One day before filing its answer, on July 9, 2007, Teledyne filed a Motion to Dismiss Section 1983 Claim ("Motion to Dismiss"). (Doc. 4). Wright filed her response (Doc. 11) on July 23, 2007. Subsequently, the court granted Teledyne's Motion to Dismiss and dismissed all § 1983 claims asserted in the case by order (Doc. 12) entered on July 24, 2007.

The court now has before it Teledyne's Motion for Summary Judgment (Doc. 20) filed on June 16, 2008, along with its supporting materials. (*See* Docs. 21, 22). After obtaining an extension of time (Doc. 23; margin order dated July 7, 2008), Wright filed her opposition and related evidence (Doc. 24) on July 11, 2008. Wright's opposition included within it a Motion to Strike. (Doc. 24 at attached Mot. to Strike).

On July 14, 2008, Wright filed a Motion to Substitute Brief ("Motion to Substitute"). (Doc. 25). One day later, on July 15, 2008, the parties filed a Joint Motion/Stipulation of the Parties Regarding Plaintiff's Response to Defendant's Motion for Summary Judgment and Defendant's Reply Thereto (the "Stipulation"). (Doc. 26).

The court granted the Motion to Substitute (Doc. 27) on July 16, 2008. In that order, the court specifically noted that by virtue of the Stipulation, Wright had withdrawn "Sections B and D of Plaintiff's Motion to Strike" leaving parts A and C. (Doc. 27 ¶ 1; *see also* Doc. 26 ¶ 3 ("Plaintiff hereby withdraws Sections B and D of the Motion to Strike included in Plaintiff's Response to Defendant's Motion for Summary Judgment and which Plaintiff filed on July 11, 2008 at Document 24-3.")).

Subsequently, Wright filed two (2) briefs in opposition to Teledyne's Motion for Summary Judgment. (*See* Docs. 28, 29). Wright then sought to withdraw Doc.

2

28.  (Doc. 30). The court granted Wright's request by margin order entered on July 21, 2008, leaving Doc. 29 as Wright's sole corrected opposition brief.

On August 5, 2008, after obtaining an extension of time, Teledyne filed its reply (Doc. 35) and also a response to Wright's Motion to Strike.  (Doc. 36).  Wright followed on August 18, 2008, with a Motion to Strike Defendant's Reply Brief (Doc. 37), to which Teledyne responded (Doc. 38) on August 20, 2008.

As discussed more fully below, the court finds that Teledyne's Motion for Summary Judgment is due to be granted.  Further, Wright's Motions to Strike are due to be denied.[1]  Finally, for the reasons explained at the end of this memorandum

---

[1]  Concerning Wright's initial Motion to Strike, Section A addresses Teledyne's inclusion of a "Preliminary Statement" in its initial brief.  Because the court does not rely upon Teledyne's introduction in ruling on summary judgment, Section A of Wright's first Motion to Strike is due to be denied and/or termed as moot.  For the reasons explained later in the court's memorandum opinion, Section C of Wright's first Motion to Strike is due to be denied.

Wright's subsequent Motion to Strike complains about the page length of Teledyne's reply brief and the format it used in responding to Wright's facts in opposition to summary judgment.  (*See generally* Doc. 37).  As neither ground suggested by Wright is valid, her second Motion to Strike is due to be denied.  First turning to page length, while Wright correctly points out that Teledyne's reply brief "excluding the cover and Certificate of Service pages" contains 20 pages (Doc. 37 ¶ 1), the court's order (Doc. 27) entered on July 16, 2008, allowed Teledyne's reply to be up to 20 pages in length.  (*See also* Doc. 26 ¶ 5 (indicating no objection by Wright to Teledyne's filing a reply brief 20 pages in length)).  Second, in challenging the format used by Teledyne on its facts in filing the reply brief, she relies upon language from the court's Uniform Initial Order relating to the "Moving Party's Initial Statement of Facts".  (Doc. 37 at 3).  Nothing contained in Teledyne's brief violates

opinion, the court declines Wright's request at the end of her second Motion to Strike that the court set this case for a hearing.  (Doc. 37 at 8).

## II.    STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation omitted).  "The substantive law applicable to the case determines which facts are material."  *Fitzpatrick*, 2 F.3d at 1115 (citation omitted).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case,  *McDonnell Douglas Corp. v. Green*, 411 U.S.

the requirements in responding to facts <u>in a reply</u>.

4

792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[2]

Under the *McDonnell Douglas/Burdine* framework, a plaintiff first has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must either prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination or present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02. The court is aware that the summary judgment rule applies in job

---

[2] Wright only argues that she has established a circumstantial case of discrimination. (*See generally* Doc. 29; *id.* at 29 (setting forth *prima facie* elements applicable in circumstantial evidence case of discrimination for failure to promote)).

discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## III.   STATEMENT OF FACTS[3]

### A.   Wright's Start at Teledyne

Wright began working at Teledyne as an engineer in 1985, at a salary of $26,644, following her graduation from college with a bachelor's degree in computer engineering.   AF No. 1.1.[4]   Wright subsequently obtained a master's degree in

---

[3]   Whenever the facts are in dispute, they are stated in the manner most favorable to the non-moving party. *See Fitzpatrick*, 2 F.3d at 1115.   Therefore, these are the facts for summary judgment purposes only.   They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[4]   The designation "AF" stands for admitted fact and indicates a fact offered by Teledyne that Wright has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case.   Whenever Wright has adequately disputed a fact offered by Teledyne, the court has accepted her version.   The court's numbering of admitted facts (*e.g.*, AF No. 4) corresponds to the numbering of Teledyne's Statement of Facts as set forth in Doc. 21 and responded to by Wright in Doc. 29.   A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.   For example, (AF No. 1.1) would indicate the first sentence of paragraph 1 of Teledyne's Statement of Facts is the subject of the court's citation to the record.

Because of the voluminous number of facts asserted by the parties, the court has endeavored to limit its recitation to those facts it finds to be critical to its decision.   Any other facts referenced by the parties that require further clarification

Engineering Management, paid for by Teledyne.  AF No. 1.2.

**B.     Teledyne's NASA-Related Subcontract Work**

In 2005, Teledyne was and had been performing under a subcontract with The Boeing Company ("Boeing") to carry out a particular task that was part of a larger contract Boeing had with the National Aeronautics and Space Administration ("NASA").  AF No. 2.1.  The prime contract between Boeing and NASA was called the International Space Station Payload Integration Contract or "IPIC."  AF No. 2.2.

The task or function subcontracted to Teledyne was the Payload Operations Integration function, referred to as "POI" or "POIF."  AF No. 3.1.  POI involves, generally, the preparation for and operation of science experiments on board the International Space Station and the transportation of those by way of the Space Shuttle.  AF No. 3.2.

The POI subcontract was performed at the Marshall Space Flight Center in Huntsville.  AF No. 4.  Wright had begun working under the IPIC in approximately 1997, in a non-managerial position called operations controller.  AF No. 5.

**C.     Wright's Position as Technical Operations Lead**

In or about 1998, Jerry Geron ("Geron") approached Wright and asked her to serve as Technical Operations Lead, or his "deputy," and Wright accepted.  AF No.

_____

are dealt with later in the court's opinion.

6. This was a new position that Geron had created. AF No. 7.1. Geron was the top manager of POI for Teledyne at the time. AF No. 7.2. Wright does not recall the requisitioning process, but does remember being approached by Geron to see if she wanted to take the position. (Doc. 22 at Ex. 1 at 85-86).

Geron was the Director of POI for Teledyne and the top manager assigned to the POI subcontract with Boeing. AF No. 14. There were six teams under Geron, each with a team lead. AF No. 9; (Doc. 22 at Ex. 2 at Ex. 12).[5]

The team leads supervised the Teledyne personnel assigned to their respective operational teams. AF No. 11.[6] Geron supervised Wright, and he supervised the team leads. (Doc. 22 at Ex. 1 at 107). The team leads could go directly to Geron with a problem. AF No. 13.2.

Wright's job as Technical Operations Lead or Geron's deputy was to assist Geron in doing whatever he asked her to do. AF No. 15. Geron was running the POI operation for Teledyne while Wright was assisting him. AF No. 16.

Geron would give directives to team leads, and he would also ask Wright to do

---

[5] Doc. 22 is Teledyne's evidentiary submission offered in support of summary judgment. Doc. 22 includes a list of contents (1 through 9) with the corresponding labeled and attached evidence. (Doc. 22 at 2). The court's numbering of exhibits to Doc. 22 uses Teledyne's system versus the alternative one that shows on CM/ECF.

[6] Wright's response does not effectively dispute this fact offered by Teledyne. (Doc. 29 ¶ 11 at 3).

so.  (*Id.* at 103).  Wright would also request "specific things [of team leads] that they were to provide to [her] as a deputy."  (*Id.*).

Regarding budgetary decisions, Geron would ask Wright to work with team leads and obtain input from them regarding any "special circumstances" and "how [the POI operation] w[as] going to meet the schedule."  (Doc. 22 at Ex. 1 at 116). Geron "could change [the] budget" based upon input from the team leads.  (*Id.*).

As Director, Geron performed duties that Wright did not.  (AF No. 18).  In particular, Wright did not do performance reviews of the team leads or issue any discipline or corrective action to the team leads; Geron did.  (Doc. 22 at Ex. 1 at 101). However, when Geron was not there, Wright "served as his deputy and took his chair."  (Doc. 22 at Ex. 1 at 181).

Wright did not know all of what Geron was doing.  AF No. 19.  Geron had created Wright's position to assist with the daily operations in POI to allow him to work on other matters, as Director, which did not involve Wright or even her awareness.  AF No. 20.   Wright had never been the "Number 1" person on the POI contract or any government contract.  AF No. 21.

**D.    Teledyne's Interactions With Boeing**

Concerning lines of communication relating to the POI subcontract, Geron interfaced with Carmen Bailey ("Bailey") of Boeing.  (Doc. 22 at Ex. 1 at 109).  The

job classification for the position that Bailey held at Boeing was "Product Engineering Program Management Specialist." (Doc. 22 at Ex. 5 at 124-25). Bailey was the top Boeing manager located in Huntsville to whom Teledyne reported on the POI subcontract. AF No. 24. Bailey's responsibilities regarding the Teledyne subcontract included as follows: "all of the budget, all of the contractual elements of that area, the statement of work, basically, oversight of any risks, [and] anything that had to go between the customer [*i.e.*, NASA] and Teledyne." (Doc. 22 at Ex. 5 at 34). Bailey's Boeing supervisor, Rick Golden, was located in Houston, Texas. AF No. 26.

As Deputy Program Manager in IPIC, Bailey had another subcontract that he was overseeing for Boeing. (Doc. 22 at Ex. 5 at 112). In this position, Bailey was responsible for the personnel evaluations, disciplinary actions and setting the salaries. (*Id.*). In this role, Bailey also had the responsibility to interface with Rickey Cissom ("Cissom"), a manager with NASA. (*Id.* at 112-13).

Bailey has a bachelor's degree, a master's degree and a doctoral degree in mathematics with the latter containing courses in applied mathematics. AF No. 32.1; (Doc. 22 at Ex. 5 at 19-21).[7] Bailey started his post-doctoral career with Teledyne in 1986. AF No. 32.2. Bailey joined McDonnell Douglas (which later merged with

---

[7] Wright's response to this specific fact (asserted by Teledyne) is not supported by the evidentiary citations upon which she relies. (Doc. 29 ¶ 32 at 5).

Boeing) in 1990 and was employed with Boeing until January of 2006 (when he was re-hired by Teledyne).  AF No. 32.3.

Geron interfaced with Bailey regarding the POI function and Geron and Bailey met frequently.  AF No. 33.1.  Bailey and Geron had "daily tag-ups" with Cissom in which Wright was not involved.  AF No. 33.2.

Boeing gave direction to Teledyne through Geron.  AF No. 34.[8]  Bailey and Geron dealt with NASA's program office at Johnson Space Center.  AF No.  35.1. Bailey had almost daily interaction with NASA's program office at Johnson Space Center.  AF No. 35.2.

### E.    Geron Announces Retirement

In about January of 2005, Geron announced to Wright and his team leads that he was going to retire in 2007.  AF No. 36.  Marty Runkle ("Runkle") is Vice President of Aerospace Systems for Teledyne.  AF No. 37.1.  Geron reported to Runkle.  AF No. 37.2.  Geron advised Runkle about his tentative retirement plans in 2004, approximately six months to one year before Geron publicly announced it early in 2005.  AF No. 38.

### F.    Geron Encourages Wright to Consider Project Manager Position

---

[8]  Wright's proposed fact in opposition is non-responsive.  (Doc. 29 ¶ 34 at 5). Regardless, Wright's own testimony confirms this fact.

Also in March of 2005, Geron alerted Wright and the team leads on POIF that there was an opportunity for a manager of a new NASA task order on a major contract Teledyne had with NASA called "SDOS."  AF No. 40.1.  "SDOS" stands for Systems Development and Operations Support.  AF No. 54.2.  Geron stated in his email that "if we have interested folks with the right background, [the task] could help us with next year's staffing problem."  AF No. 40.2.

Geron personally came to Wright's office to suggest that she look into becoming manager of that task order.  AF No. 41.  Wright did not want to pursue the position. AF No. 42. Jeff Howard ended up taking the project manager position, and he has been very successful with that project.  AF No. 43.

### G.    Changes to Overall NASA Contract

On May 17, 2005, during a telephone conference between Boeing and NASA involving Boeing's Bailey in Huntsville, Golden (Bailey's Boeing supervisor in Houston), and Dan Hartman ("Hartman"), a senior NASA program manager in Houston, NASA advised Boeing that NASA was going to extend the Boeing contract, except for the POI function.  AF No. 44.1.  The POI function instead was going to be moved to a task on an existing Teledyne contract.  AF No. 44.2

NASA's Cissom immediately contacted Bailey and encouraged Bailey to consider employment with Teledyne.  AF No. 45.  In mid-June of 2005, Teledyne's

Vice-President Runkle contacted Bailey.  AF No. 46.1.  Runkle asked Bailey if he was interested in employment opportunities at Teledyne.  Bailey Dep. 46.2.

Bailey advised Runkle that he did not feel it was a good time for such talks because, as the overseer of the Teledyne subcontract for Boeing, Bailey was involved in determining Teledyne's award fee.  AF No. 47.  Bailey advised that any such conflict of interest would be gone once Bailey was no longer over the POIF work, which would occur no later than October 1, 2005, when NASA would be dealing directly with Teledyne regarding the POIF.  AF No. 48.

Bailey assumed an assignment by Boeing to work on an Army contract regarding Ground Missile Defense.  AF No. 49.1.  He began that assignment at the beginning of August 2005.  AF No. 49.2.

### H.    Wright's Deputy Position to be Eliminated

On August 23, 2005, after his meeting with Cissom and Woodard, Geron told Wright that her position was being eliminated for budget reasons.  AF No. 51.  On August 23, 2005, Geron directed Wright to talk with Bill Stewart ("Stewart") to pick up some other task orders and try to find a project management position.  AF No 53. Stewart is employed by Teledyne as the program manager of the major Teledyne SDOS contract with NASA.  AF No. 54.1.

After being told that her position as Technical Operations Lead was being

eliminated, beginning in August of 2005, Wright was assigned to manage some task orders (outside of POI) on the SDOS contract, and Wright also began performing business development work, chargeable to Teledyne's overhead, while continuing to perform some Technical Operations Lead/deputy duties with that time being charged to POI . AF No. 58.

Effective October 1, 2005, Teledyne began performing the POI function as a task order to Teledyne's SDOS contract with NASA. AF No. 55.1. POI was a critical project for Teledyne with much visibility.[9]  AF No. 57.  The POI task order on the SDOS contract was known as Task Order 24.  AF No. 55.2.  Geron's title became Director of Space Operations.  AF No. 56.1.  He continued to report to Runkle.  AF No. 56.2.

By late 2005, the number of full-time equivalent positions relating to the POI work at Teledyne had been reduced; however all team lead positions and Wright's position were still standing.  AF No. 59. Also, the POI operational teams were consolidated from five teams at the start of 2005 to three teams by the end of 2005. AF No. 60.  More specifically, two team lead positions -- those held by Bruce Coole ("Coole") and Roxana Sherwin ("Sherwin") -- were eliminated.  AF No. 61.

Sherwin, a white female, left Teledyne for employment elsewhere.  AF No.

---

[9]  Wright's fact offered in opposition is non-responsive.  (Doc. 29 ¶ 57 at 6).

14

62.1.  Coole, a white male, was reassigned to an operations controller (non-management) position on the Mission Planning Team.  AF No. 62.2.  Due to reassignments within Teledyne and resignations, only about twelve Teledyne employees had to be laid off.  AF No. 63.[10]

## I.    Teledyne's Considerations Relating to Geron's Retirement

After Boeing was eliminated by NASA as the prime contractor on the POI work, Bailey and Runkle discussed employment opportunities for Bailey at Teledyne.  AF No. 64.  Bailey completed an employment application dated November 30, 2005, and Runkle interviewed Bailey.  AF No. 65.

Runkle was mindful of Geron's retirement, expected about a year later, in January of 2007, and was looking for an executive manager to run what was now a prime contract with Teledyne's key customer (*i.e.*, NASA).  AF No. 66.  Bailey told Runkle that he understood the area of payload operations integration from having overseen the contract, and that he felt he had a relationship with the team members there.  AF No. 67.1.  Bailey told Runkle that he required an even more expansive job than Geron's job, though.  AF No. 67.2.  Bailey wanted to grow the operation and do business development.  AF No. 67.3.  Besides payload operations, Bailey discussed

---

[10]  Although Wright attempts to dispute this fact, she provides an incomplete corresponding evidentiary citation; therefore, it is deemed admitted.  (Doc. 29 ¶ 63).

with Runkle where he thought Teledyne could go in terms of space operations and explorations, including the lunar program.  AF No. 67.4.  Runkle wanted to add more emphasis on business development as well.  AF No. 68.

Runkle considered Bailey as well as Geron's "Level 2 managers" as potential successors upon Geron's retirement.  AF No. 69.1.  The Level 2 managers included Geron's team leads and Wright.  AF No. 69.2.  It was a comparative process involving consideration of Bailey and candidates within Teledyne.  AF No. 69.3.

However, Bailey did affirmatively indicate that he had the understanding from speaking with Runkle that he was promised the director's position.  (Doc. 22 at Ex. 5 at 70-71).  Further, Bailey testified that he had this conversation with Runkle in November of 2005, before the job was ever announced.  (*Id.* at 65).[11]

Teledyne has a process for the posting of requisitions for hiring purposes; however, not all hirings go through the process of the posting of requisitions.  AF No.70.1; AF No. 71.[12]  Instead, as a matter of practice Teledyne managers identify

---

[11]  In responding to Teledyne's proposed paragraph 69, Wright provides an incomplete corresponding evidentiary citation to Runkle's deposition testimony, and the evidentiary citations from Bailey's deposition testimony do not clearly refute Runkle's testimony that he considered Wright as one of the candidates and conducted a comparative process; therefore, the court accepts Teledyne's version as modified by Bailey's testimony about his selection as noted above.

[12]  Wright's proposed fact in opposition to Teledyne's paragraph 70 that Teledyne "violated its recruitment, internal transfers, reduction-in-force, EEO and

viable candidates for a position from ways other than the requisition process, such as the use of personal contacts.  AF No. 70.2.  Teledyne did not post a requisition advertising for Geron's job.  AF No. 72.

### J.    Runkle's Decisionmaking Process

Runkle made the decision to hire Bailey to replace Geron.  AF No. 80.  Runkle testified regarding Wright as a potential replacement for Geron that during a group meeting "Cissom said that Ms. Davis-Wright was, in his opinion, based on his experience in working with her, an unacceptable candidate to replace Jerry Geron." (Doc. 22 at Ex. 3 at 36).[13]  Similarly Geron testified that "Cissom  called a meeting

_____

promotion from within policies" (*see* Doc. 29 ¶ 70 at 7), is unhelpful as Teledyne admits that the posting process was not followed in this instance and is otherwise non-responsive and/or improperly characterizes the legal and/or factual import of the cited testimony.

[13]   While admittedly Geron's testimony and corresponding questioning by counsel are not without some confusion over Cissom's views relating to Wright (*i.e.*, her replacing Geron versus her no longer serving as long-term operations lead and instead moving her to a project management position (*see*, *e.g.*, Doc. 22 at Ex. 7 at 43)), Wright offers no evidence to refute Runkle's testimony regarding Cissom's opinion that she was an unacceptable candidate to replace Geron.

Instead, Wright challenges Teledyne's reliance upon testimony from its employees, including Runkle, about comments made to them by Cissom on the grounds that such evidence constitutes inadmissible hearsay.  More specifically, Wright objects to the factual paragraphs (and the corresponding deposition testimony) relied upon by Teledyne including: 39, 45, 50, 73 and 86.  (Doc. 36 at 2).  While Wright suggests that the court should not consider this evidence in support of summary judgment on the grounds of hearsay, she fails to articulate how the

statements are hearsay.  By itself, Wright's failure to substantiate why any of the challenged testimony is improper hearsay calls for her initial Motion to Strike (Doc. 24) to be denied as to Section C.

Alternatively, from a merits standpoint, the court agrees with Teledyne that Wright's objection on the basis of hearsay is substantively off the mark.  Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).  As the Eleventh Circuit explained in *United States v. Cruz*, 805 F.2d 1464 (11th Cir. 1986):

> In *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250 (5th Cir.1980), we recognized that an "out-of-court utterance must have two characteristics before it is rendered inadmissible as hearsay: It must be a 'statement'-that is a verbal assertion or conduct intended as an assertion, Fed. R. Evid. 801(a)-and it must be offered to prove the truth of the matter it asserts. . . .  Thus, excluded from the hearsay rule is verbal or nonverbal 'conduct when it is offered as a basis for inferring something other than the matter asserted.'" *Id.* at 262 (citations omitted) (emphasis in original). Consequently, an utterance may be admitted to show the effect it has on a hearer, 4 Weinstein & Berger, *Weinstein's Evidence* ¶ 801(c)[01], at 801-77 (1979). Such verbal acts are not in the first instance assertive statements and not offered to prove the truth of the matter asserted.

*Cruz*, 805 F.2d at 1477-78.  Here, as Teledyne points out, the comments made by Cissom to Runkle and other Teledyne witnesses are admissible under *Cruz* for two separate reasons.  First, the utterances are "not offered for the truth of the matter asserted, but [rather] to show the effect on the person who heard it."  (Doc. 36 at 4 (citation omitted)).  Second, the comments are "not even [] assertive statements, but more in the nature of an order or a request and is, to a large degree, not even capable of being true or false.'" (Doc. 36 at 4-5 (citations omitted)); *see also Weaver v. Tech Data Corp.*, 66 F. Supp. 2d 1258, 1265 (M.D. Fla. 1999) ("The assertions that Plaintiff alleges are inadmissible hearsay are 'not offered to prove the truth of the matter asserted, but to demonstrate the assertions' effect on the managers who participated in making the decision to demote [Plaintiff].' (Dkt. 36).  Therefore, the

with Marty Runkle, myself and Bill Stewart on June 3rd [2005] at which time he, basically informed us that Brenda [*i.e.*, Wright] would not be approved as my replacement by him, he did not see her as an acceptable candidate to replace me." (Doc. 22 at Ex. 7 at 46).  Geron also testified that "the reason I moved Brenda [*i.e.*, Wright] was my customer said, 'You need to move Brenda to some other place because I don't see her long-term as an operations lead, and I need to get somebody in there that will help with integration.'" (*Id.* at 41-42).

Cissom's opinion regarding Wright was not the only factor in Runkle's eventual decision to hire Bailey.  AF No. 74.1.  Experience as a program manager was also a key criterion for Runkle, and Wright had never been the person in charge of any project.  AF No. 74.2.  Geron had previously managed programs in his Air Force career before Teledyne.  AF No. 75.

Regarding Bailey's experience as a program manager, while there does appear to be some confusion in the record regarding the actual job titles held by Bailey at Boeing, as Runkle testified "[t]he job that he [*i.e.*, Bailey] performed was the job he performed.  Now, he called it by two different names [*i.e.*, deputy program manager

---

Court finds that Plaintiff's Motion to Strike portions of Defendant's affidavits for containing inadmissable hearsay will be denied.").    Accordingly, Section C of Wright's Motion to Strike is due to be denied for the separate and independent reason that the testimony objected to by Wright is not hearsay.

versus product engineering program management specialist (*see, e.g.*, Doc.

3 at 19-21; *id.* at Ex. 6 at Ex. 7-B at TBE 00480)] at two different times, that may be

the case.  But the job that he performed was as the senior Boeing site representative

here in Huntsville running the activity at the Marshall Space Flight Center." (Doc.

22 at Ex. 3 at 21).  Runkle also stated that while Bailey did not have any experience

running Teledyne programs, he "of course, ran the entire prime contract part of the

Boeing effort for IPIC.  His station was, in fact, a level higher than our subcontract

station.  So he was a manager at a higher level than Mr. Geron was." (Doc. 22 at Ex.

3 at 40-41(emphasis added)).  As Runkle further responded regarding a question

about needing time to get Bailey "up to speed[:]" "Any executive manager that comes

in, I don't care who you are, when you come in, you are going to need some spin-up.

Again, it's not a big deal.  I mean, this isn't like you have to take a person and put

them through any major training program.  The person who comes in as a senior

manager is able to take over in managing a major program." (Doc. 22 at Ex. 3 at 41).

Runkle was personally familiar with Bailey's work as a Boeing manager and

thought he was successful.  AF No. 77.  While still a Boeing employee, Bailey had

received a Director's Commendation Award from the NASA IPIC program office at

Johnson Space Center in June of 2005.  AF No. 78.  In 2003, Bailey had received a

public service medal from NASA for outstanding leadership in bringing the payload

operations and integration together during the first start-up of the payload onboard the Space Station.  AF No. 79.

Regarding his replacement selection, Runkle testified, "we are in a comparative process here.  I have already identified one candidate [*i.e.*, Bailey] who was, basically, in my opinion, an optimum candidate based on his background, experience, and performance with the candidates that we had within the company, I ended up with the selection of Carmine [*i.e.*, Bailey]."  (*Id.* at 13).  Runkle later stated regarding his decision-making process that "if you compare the two resumes, the two backgrounds and you make a choice, to me it was a clear choice that Mr. Bailey was the one to hire."  (Doc. 22 at Ex. 3 at 44).

Runkle told Cissom that Teledyne was going to hire Bailey, and Cissom responded favorably.  AF No. 86.   Runkle also consulted with Geron regarding the hiring of Bailey.  AF No. 85.  However, Runkle was never directed by anyone to hire Bailey, and Runkle did not feel pressure to do so.  AF No. 87.

Runkle formally interviewed Bailey in November 2005.  (Doc. 22 at Ex. 5 at 65).  In late 2005, just before Christmas, Runkle negotiated with Bailey regarding salary and the nature of the job.  AF No. 84.  Bailey was offered employment with Teledyne in December of 2005 with the express intention that he would replace

Geron as Director upon Geron's retirement.  AF No. 88.[14]

### K.    Bailey's Employment With Teledyne

Bailey's final salary with Boeing was $128,000.  AF No. 89.  Bailey's starting salary with Teledyne, which he negotiated with Runkle, was $140,000.  AF No. 90. Bailey left Boeing and started employment with Teledyne on January 16, 2006.  AF No. 91.  When Bailey was re-hired by Teledyne in 2006, Geron was not yet retired, and he did not immediately begin performing Geron's position which was by that time called Director of Space Operations.  AF No. 92.

Bailey initially performed several assignments.  AF No. 93.1.  One assignment was to serve as a lead of the "ops group" (Bailey Dep. 66), which was a portion of the POIF Training Team under Team Lead Lynn Baker.  AF No. 93.2.

Bailey also was assigned, at NASA's request, to work on a study for the lunar precursor robotics program, grooming a NASA employee, Ray Echols, to manage that

---

[14] Prior to Runkle's  decision to hire Bailey, he "negotiated a[n earlier] deal [in 2004] where [Bailey] wanted to come onboard [at Teledyne] and he would, in fact come onboard as a potential successor to Jerry Geron, and that he would come onboard after the first of the year [*i.e.*, in 2005].  We made that agreement before Christmas, and he would come onboard after the first of the year."  (Doc. 22 at Ex. 3 at 14).  However, despite approval by three people, including the President of Teledyne, that particular agreement did not ever materialize.  (Doc. 22 at Ex. 3 at 8 ("And after we thought about it a little bit, we thought, well, if we did make him [i.e., Bailey] an offer, we would probably put him in a conflict-of-interest situation.  And so we both just kind of backed out at that point in time."); *id.* at 9 ("The 20 August, 2004, document that didn't go anywhere.")).

program.  AF No. 94.  As a Teledyne employee, in June of 2006 Bailey received a Group Achievement Award from NASA for work that he did as part of the Lunar Precursor Robotics Program.  AF No. 95.  In addition, Bailey worked with Teledyne business development personnel on a business opportunity they were pursuing at the Glenn Research Center.[15]

Bailey did not function as Geron's deputy.[16]  In March of 2006, Runkle asked Bailey, in addition to his other duties, to act as the business development director in his office, as the then current Director of Business Development for Teledyne (John Hall) had resigned.  AF No. 98.1.  This was not Space Station work.  AF No. 98.2.

Bailey was given an office in Runkle's area at Teledyne as well as in the Task Order 24 area at Marshall Space Flight Center.  AF No. 99.  Geron retired from Teledyne effective May 1, 2007, and Bailey assumed the position of Director of Space Operations.  AF No. 100.

## L.    Changes in Available Positions at Teledyne and Wright's Current Status With Teledyne

In early 2005 Teledyne's program management office for POIF included a

---

[15]    Wright's stated opposition to this fact, that her Teledyne business development activities were more job-related, is non-responsive.  (Doc. 29 ¶ 96 at 8).

[16]  Wright's stated opposition about the level of Bailey's beginning  salary in relationship to his organizational positioning within Teledyne is non-responsive. (Doc. 29 ¶ 97 at 9).

Director, a deputy and two administrative assistants.  AF No. 101.  By April of 2006, Teledyne's program management office for POIF had been reduced to the Director and one administrative assistant.  AF No. 102.  There has never been a position of deputy to the Director since the elimination of the Technical Operations Lead position held by Wright.  AF No. 103.[17]

In January of 2006, Wright was assigned to work as an operations lead (or "ops lead") on the POI Training Team.  AF No. 104. The ops lead position was not a management position and not a position Wright wanted to stay in long term.  AF No. 105.   In mid-February of 2006, Wright was assigned to the POI Mission Planning Team in another non-managerial position.  AF No. 106.

In June of 2006, Teledyne offered Wright a project manager position, which she accepted.[18]  AF No. 108.  Teledyne would not have maintained indefinitely Wright's Level 2 manager salary (which was $98,467 as of June of 2006), were she to have stayed in a non-managerial position.  AF No. 109.[19]

---

[17]  Wright's stated response to this fact offered by Teledyne includes no corresponding evidentiary citation (Doc. 29 ¶ 103 at 9); therefore, Teledyne's version is deemed admitted.

[18]  Prior to that time, Wright had been advised by Geron to seek a project manager position within Teledyne in August of 2005.  AF No. 107.

[19]  Wright's stated response to this fact offered by Teledyne includes no corresponding evidentiary citation (Doc. 29 ¶ 109 at 9); therefore, Teledyne's version

Wright has never had a salary decrease at Teledyne, and she has received a raise every year of her employment.  AF No. 116.  As of her last raise (August 2007), Wright's salary is $108,076 ($4,156.80 biweekly).  AF No. 117.[20]

## M.   Self' Employment at Teledyne

Nancy Self ("Self") began employment at Teledyne in a non-managerial position called an operations lead ("ops lead") on the Training Team on April 17, 2006.  AF No. 110.[21]  Self's salary for that position was $57,512, and it was less than what Wright was approximately making at that time (*i.e.*, $97,000-$98,000).  AF No. 111; (Doc. 22 at Ex. 1 at 242).[22]

Self had been interviewed by Bailey, Lynn Baker and Geron.  AF No. 112.  At least two other applicants outside of Teledyne were interviewed for the job for which Self was hired.  AF No. 113.  Self's hiring was prompted by Brian Little's leaving the

---

is deemed admitted.

[20]  Wright's stated response to this fact offered by Teledyne includes no corresponding evidentiary citation and is also non-responsive (Doc. 29 ¶ 117 at 9-10); therefore, Teledyne's version is deemed admitted.

[21]  Wright's stated response to this fact offered by Teledyne includes no corresponding evidentiary citation (Doc. 29 ¶ 110 at 9); therefore, Teledyne's version is deemed admitted.

[22]  Wright's stated response to this fact offered by Teledyne includes no corresponding evidentiary citation and is also non-responsive (Doc. 29 ¶ 111 at 9); therefore, Teledyne's version is deemed admitted.

group.  AF No. 114.[23]  There were approximately fourteen ops leads on the Training

Team at that time.  AF No. 115.

## IV.   ANALYSIS

### A.   Wright cannot establish a circumstantial evidence case of discrimination.

#### 1.   Wright's *prima facie* case of discrimination.

The *prima facie* elements that Wright must establish to maintain her "ordinary

failure-to-hire" claim of race/sex discrimination are as follows:

> The standards for a *prima facie* case of failure-to-hire are thoroughly established. The burden is on the plaintiff to show that she is a member of a protected class, that she applied for and was qualified for an available position, that she was rejected, and that the defendant filled the position with a person outside of the protected class.

*Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1274-75 (11th Cir.

2002) (citations omitted).  Teledyne's <u>lawyers</u> maintain that Wright's *prima facie*

case fails due to her inability to show that she was qualified for the position in which

she applied.  However, the court notes that in presenting this argument, counsel fails

to substantiate any place in the record where the undisputed decisionmaker, *i.e.*,

Runkle, ever indicated, generally or specifically, that Wright was not <u>qualified</u> for the

---

[23]   Wright's stated response to this fact offered by Teledyne includes no corresponding evidentiary citation (Doc. 29 ¶ 114 at 9); therefore, Teledyne's version is deemed admitted.

26

position.   In fact, Runkle testified that he considered all the candidates in a

comparative process, and necessarily implied that Wright was one of them.[24]

Indeed, even Teledyne's own statement of facts offered in support of summary

judgment and adopted by the court as set forth above, supports the inference that

Wright was qualified to replace Geron <u>because she was one of the candidates that

Runkle considered</u>:

> Runkle considered Bailey as well as Jerry Geron's "Level 2 managers,"
> as potential successors upon Geron's retirement.  <u>The Level 2 managers
> included Geron's team leads and Wright</u>.  It was a <u>comparative process</u>
> involving consideration of Bailey and candidates within Teledyne.

(Doc. 21 ¶ 69 (internal citations omitted) (emphasis added)).   If Wright were

unqualified for the position, then there would be no reason for Runkle to engage in

a comparative process that included her in the mix of possible candidates to select to

fill the vacancy created by Geron's retirement.

Also, to the extent that Cissom indicated to Runkle that Wright was not an

acceptable candidate for filling the position, this opinion, by a non-party witness,

---

[24] The court notes that Geron testified that Wright "is a good performer, but she was not qualified to take my position at this time."   (Doc. 22 at Ex. 7 at 82). However, Teledyne has not endeavored to explain the degree to which Geron was involved in the decision-making process relevant to Wright's qualifications, and has instead limited its analysis and argument on summary judgment to <u>Runkle's</u> consideration of Wright for the vacant position.  As explained *infra*, the court is under no obligation to develop potential arguments for either side on summary judgment, and does not for Teledyne here.

does not establish that she was unqualified, but rather merely shows a client preference that she not be selected.  Additionally, Teledyne's argument in this section of its brief (to the extent it has even made a separate one) really is more of a pretext/ comparative qualifications one.  Therefore, for all these reasons, the court assumes without deciding that Wright was qualified to fill Geron's position upon his retirement.

### 2.    Regardless, Wright cannot establish pretext.

Accepting without deciding that Wright has established a *prima facie* case of discrimination on the basis of race and/or gender, summary judgment is still proper because she cannot show pretext.  In addressing the issue of pretext, the Supreme Court has stated:

> Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability.  Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. <u>For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.</u> . . .

28

> Whether judgment as a matter of law is appropriate in any
> particular case will depend on a number of factors.  Those include the
> strength of the plaintiff's *prima facie* case, the probative value of the
> proof that the employer's explanation is false, and any other evidence
> that supports the employer's case and that properly may be considered
> on a motion for judgment as a matter of law.

*Reeves*, 530 U.S. at 148-49 (emphasis by underlining added) (citations omitted).

Therefore, despite a plaintiff's efforts to demonstrate an issue of fact regarding the

truthfulness of an employer's asserted justification for an adverse action, judgment

as a matter of law in favor of the employer is still appropriate if the record: (1)

conclusively demonstrates some other, non-discriminatory basis for the decision; or

(2) reveals only a weak issue of fact coupled with plentiful evidence that no illegal

discrimination took place.

Here, Teledyne has offered testimony from Runkle that explains his decision-

making process in choosing Bailey over Wright in filling Geron's vacant position.

More specifically, as Runkle has testified, he based his decision in part upon the

client's (*i.e.*, Cissom's) opinion that Wright was not an acceptable candidate and

Runkle's own opinion that Bailey had superior qualifications over Wright that made

him the logical choice.  In particular, Runkle believed that Bailey's prior experience

as a program manager was a key criterion in favor of Bailey.  In contrast, as Runkle

explained, Wright had never been the person in charge of any project.

With Teledyne's articulation of a legitimate explanation for its selection of Bailey, it is incumbent upon Wright to show pretext as to those reasons.  Further, it is not enough to demonstrate that Teledyne made a mistake or an error in judgment as an employer in reaching this conclusion.  So long as the record shows that Teledyne had a good faith honest belief about its decision to select Bailey over Wright, then a material factual dispute as to pretext cannot be established.  As the Eleventh Circuit succinctly and unequivocally explained pretext in *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466 (11th Cir. 1991):

> Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA [Title VII, or §1981] does not interfere.  Rather, our inquiry is limited to <u>whether the employer gave an honest explanation of its behavior</u>."  *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted). . . .
>
> <u>Elrod has offered no evidence to show that Sears' justification is unworthy of credence</u>.

*Elrod*, 939 F.2d at 1470 (emphasis added); *see also Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004) ("The relevant issue here, however, is not whom we would determine to be better qualified for the job.  *See Elrod*, 939 F.2d at 1470. <u>Again, we do not sit in judgment of the wisdom of an employer's selection</u>.") (emphasis added), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006)).

30

Here, Wright similarly fails in her burden in opposing summary judgment in that she has presented <u>no</u> evidence tending to show that Runkle's reasons for selecting Bailey over her are a pretext for either race or gender discrimination. "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. 502, 515 (citation omitted) (emphasis in original).

More specifically, Wright has not pointed evidence in the record from which a reasonable jury could conclude that Runkle's reasons for picking Bailey over her due to Cissom's opinion that Wright was not an acceptable candidate and Runkle's opinion that Bailey possessed superior qualifications over her for the position were not only untrue but also that Runkle's decision was really improperly motivated by race and/or gender. For example, Wright has not offered any evidence (*e.g.*, any discriminatory remarks made by Runkle in the context of the decision-making process) that tends to show that he harbors a discriminatory animus against minorities and/or women generally or against Wright specifically because she is a black woman.

Also, Wright has not shown a degree of such "'disparities in qualifications [between her and Bailey] . . . that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate [*i.e.*, Bailey] selected over the plaintiff [*i.e.*, Wright] for the job in question.'" *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1254

(11th Cir. 2000) (citation omitted); *see also Ash*, 546 U.S. at 457-58 (rejecting Eleventh Circuit's reliance upon the "slap you in the face" standard in evaluating pretext in a comparative qualifications case, suggesting other more helpful standards, but electing not "to define more precisely what standard should govern pretext claims based on superior qualifications"). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). In sum, Wright's has not effectively rebutted Teledyne's reasoning for choosing Bailey over her to succeed Geron.

Furthermore, Teledyne's failure to post the job vacancy is insufficient evidence of pretext in this instance for a number of reasons. One, it is undisputed that Teledyne did not always post job vacancies. Two, Runkle had familiarity with the candidates' skills and qualifications, and testified that he considered Wright amongst that group as part of a comparative process.

In a case involving similar circumstances, including an employer that "did not always post available positions[,]" the Eleventh Circuit made it clear that "even where preselection violates corporate personnel policies, it does not necessarily indicate racial discrimination." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007) (citing *Kennedy v. Landon*, 598 F.2d 337, 341

32

(4th Cir. 1979); *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995) ("'The mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual.'")).

Akin to Wright, the plaintiff in *Springer* argued that pretext could be inferred from the preselection of a candidate "without the internal posting of the position" as required by corporate policy. *Id.* In rejecting the plaintiff's attempt to show pretext in this manner, the court further explained that when "a supervisor has first-hand knowledge of the potential applicants and makes an employment decision based on that knowledge, the failure to post the job is insufficient evidence of pretext." *Id.* Wright's efforts to show pretext with this type of evidence are likewise unavailing.[25] Therefore, for all these reasons, Wright has failed to establish a material factual dispute as to pretext, and summary judgment in favor of Teledyne is due to be granted as to Wright's promotion claim that Teledyne filled with Bailey.

---

[25] Similarly flawed is any attempt by Wright to show pretext through the elimination of her position as Technical Operations Lead or deputy to Geron, as the undisputed evidence establishes that NASA directed Teledyne to make this cut for budgetary reasons and, since then, the position has never been revived. AF No. 51; AF No. 103.

**B.      Abandoned  Claims  and/or  Undeveloped  Arguments  in Opposition to Summary Judgment**

Due to the shotgun nature of Wright's complaint, the exact scope of the employment discrimination claims sought by her beyond Teledyne's promotion of Bailey to Geron's position (upon his effective retirement date) is not entirely clear to the court.  (*See generally* Doc. 1 at "**STATEMENT OF CLAIMS**" at "**Count 1: Race and/or Sex Discrimination**" ¶¶ 29-33).  In particular, while Wright indicates that she only has one count against Teledyne for employment discrimination, she uses language in her pleading that implies that she is complaining about <u>more than one type of cognizable employment discrimination under Title VII</u>, and also that she is complaining about Teledyne's actions concerning <u>more than one position</u>.

For example, Wright asserts that Teledyne "has engaged in a <u>pattern and practice</u> of race and sex discrimination, . . . and that said discrimination has had a <u>disparate impact</u> upon the upward movement of minorities and women, and minority women in particular[.]"  (Doc. 1 ¶ 29 (emphasis added)).  Wright further maintains that "she is a victim of the aforesaid pattern of race and sex discrimination, and of intersectionality; and that [Teledyne]'s aforesaid actions were <u>intentional</u> and contrived to preclude her advancement to the next rung on her career ladder[.]"  (*Id.* ¶ 30 (emphasis added)).

Disparate impact (or unintentional discrimination) and disparate treatment (or intentional discrimination) are two distinct theories under Title VII that involve varying elements of proof to sustain them. *See, e.g., In re Employment Discrimination Litigation Against State of Alabama*, 198 F.3d 1305, 1310 n.8 (11th Cir. 1999) (recognizing distinction between disparate impact and disparate treatment cases under Title VII). Wright's blending of these independent methods of proving Title VII discriminatory liability within one count is confusing. Similarly unclear is Wright's use of the term "pattern and practice" which has a particularized meaning under the statute that relates to when the Attorney General "may bring an appropriate lawsuit[,]" and like disparate treatment cases, requires proof of "discriminatory intent on the part of the employer." *Id.* (citations omitted).

Wright also states that she is complaining that "her position as Geron's Deputy was fully funded" and that "upon his retirement he was replaced; and two (2) outsiders, Self and Bailey, were hired non-competitively and in violation of [Teledyne]'s recruitment and placement, reduction-in-force and EEO policies, in lieu of placing her in said positions." (Doc. 1 ¶ 32 (emphasis added)). Wright then further references Teledyne's "discriminatory acts" "caused her to suffer the [described] damages[.]" (*Id.* ¶ 33). Accordingly, Wright appears to be complaining about more than one adverse employment action by Teledyne in her complaint.

35

However, the parties' briefs on summary judgment are limited solely to an analysis of Teledyne's decision to place Bailey in Geron's vacant position and whether it was discriminatorily motivated by either race or gender.  In particular, in opposing summary judgment, Wright never argues that regardless of whether Teledyne is entitled to summary judgment on its decision to fill Geron's vacant position with Bailey, she still would have a separate and independent claim pending against Teledyne for either discriminatory impact and/or its discriminatory treatment of her in hiring Self as an outsider.[26]  (*See, e.g.*, Doc. 29 at 29 ("In the instant case, it is undisputed that Plaintiff is a member of two protected groups, to wit: race - African American and sex - female.  It is also undisputed that Plaintiff was qualified for the position; that she was denied an opportunity to submit an application for the position, as the Defendant cut a deal to hire Bailey and then pre-selected him without even posting the job."); *see generally id.* at 28-30 (limiting entire discussion to Teledyne's selection of Bailey to replace Geron)).

As a result of this significant omission, it is appropriate for this court to treat

---

[26]   The court notes that, from a merits standpoint, there is nothing fundamentally nefarious about an employer's decision to hire someone from the "outside."  For example, as Runkle testified generally about Teledyne's hiring decisions, "Well, what he said is, '. . . we strive to promote within.'  And I would say all things being equal, we certainly would do that.  But if things are not equal, as a responsible manager I would hire the best candidate that I could hire.  And given all things equal, I certainly would hire from within."  (Doc. 22 at Ex. 3 at 54).

as abandoned any other potential claims that Wright may have attempted to include in her complaint, but that she failed to address on summary judgment. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001); *cf. McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

Alternatively, Wright has insufficiently opposed the entry of summary judgment in Teledyne's favor by omitting any references to or discussion of other

37

potential claims that remain for trial. *Dunmar Corp.*, 43 F.3d at 599 ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.") (citation omitted)). "[T]he onus is upon the parties to formulate arguments[.]" *Dunmar*, 43 F.3d at 599 (citation omitted).  Relatedly, this court is not responsible for satisfying Wright's burden in responding to summary judgment by suggesting, on its own initiative, any material issues that may exist for a jury to resolve as to those undeveloped claims. Therefore, because Wright has failed to carry her burden in constructing her own contentions relating to any other possible claims that she may have against Teledyne that are supported by the record, summary judgment is due to be entered in favor of Teledyne as to them (to the extent that any additional claims are even being pursued by Wright) for this separate reason.

## V.    CONCLUSION

Therefore, as analyzed above, Teledyne's Motion for Summary Judgment is due to be granted, and Wright's complaint against Teledyne is due to be dismissed with prejudice.  Further, Wright's initial Motion to Strike is due to be denied or alternatively, due to be denied in part and termed in part as moot.  Similarly, Wright's subsequent Motion to Strike is due to be denied.  Finally, because the summary judgment issues are straightforward, the court sees no benefit to holding a hearing (as

requested by Wright) and, in its discretion, declines to set one.  The court will enter

an order consistent with this memorandum opinion.

     **DONE** and **ORDERED** this the 7th day of November, 2008.

**VIRGINIA EMERSON HOPKINS**
United States District Judge